

---

Rivkin, Radler & Kremer by Scott Y. Stuart, Uniondale, NY, for Debtor.

Windels, Marx, Davies & Ives by Michael Moriarity, New York City, for Oak Re.

Albanese, Albanese & Fiore, by Thomas Sherwood, Garden City, NY, for Enron Power Marketing, Inc.

Theodore Sklar & Robert Garfinkel, Hauppauge, NY, for The County of Suffolk.

Michael J. Eng, Hicksville, NY, for Long Island Lighting Co.

Gilmartin, Opster & Schafto by Howard C. Buschman III, New York City, for Hubbard Sand & Gravel.

### In re HUBBARD POWER & LIGHT, Debtor.

### Bankruptcy No. 895–86600–478.

United States Bankruptcy Court, E.D. New York.

Nov. 18, 1996.

### MEMORANDUM DECISION

DOROTHY EISENBERG, Bankruptcy Judge.

This case comes before the Court pursuant to an Order to Show Cause and Application made by Hubbard Power & Light, Inc., the debtor (the "Debtor" or "HPL") seeking authorization for HPL to incur $750,000 of post-petition financing from Enron Capital & Trade Resources Corp. ("Enron") pursuant to sections 364(c) and (d) of the Bankruptcy

Code. The Debtor filed a Memorandum of Understanding executed by both Enron and the Debtor memorializing the proposed loan transaction which proposes to provide to Enron a super-priority lien in exchange for the loan to the Debtor. Opposition was interposed by the New York State Department of Environmental Conservation ("DEC"); Oak Re, who represents the bondholders holding a lien on all of the Debtor's real and personal property, and who is the Debtor's senior secured creditor; and Hubbard Sand & Gravel Corp. (the "Landlord"). In addition, the County of Suffolk, New York (the "County"), an alleged lienholder on the Debtor's real property, strongly objected to the proposed financing, although it did not file any opposition papers with the Court. The Court scheduled interim and final hearings.

An evidentiary hearing was conducted on November 6, 1996. After the hearing, this Court issued an oral decision from the bench granting the Debtor's motion and approving the financing. At that time, a request was made that a written decision be provided to the parties. This opinion constitutes the Court's Memorandum Decision.

## BACKGROUND

HPL is a New York corporation engaged in the production of electrical power under an agreement entered into in 1988 with the Long Island Lighting Co. ("LILCO") called the Parallel Generation Agreement (the "PGA"). The Debtor's president and sole shareholder is James Solano ("Solano"). HPL's power generation facility is located on approximately two (2) acres of land in Bay Shore, New York (the "Bay Shore property"), which real property is owned by the Debtor. In conjunction with its operations, it also leases adjoining property from the Landlord. HPL's main business activity is the collection of wood debris which it sorts, cuts and makes into wood chips and then burns at its plant to produce steam which, in turn, generates electricity that HPL sells to LILCO under the PGA.[1]

The Debtor's Bay Shore property sits adjacent to two larger pieces of land, one of which is owned by the Landlord. The Debtor has two other related entities, Quality Resource Recovery Corp. and Quality Resource Corp., which operate in conjunction with HPL. One of these is located on the adjacent parcel which the Debtor leases. Both entities have their own Chapter 11 cases pending before this Court.

In early June, 1995 the DEC inspected HPL's power producing plant and found that the Debtor was in violation of the special conditions of its operating permit issued by the DEC. Under the DEC permit, HPL was required to separate and remove all painted or treated wood chips and burn only clean, unadulterated wood chips. On June 28, 1995 the DEC commenced an action in New York State Supreme Court, Suffolk County to enjoin the Debtor from burning adulterated wood in violation of the New York State Environmental Conservation Law. HPL and the DEC later agreed to a Consent Order including a temporary restraining order that effectively shut down HPL's plant. The Debtor's plant has been non-operational since July 1995.

In August 1995, the wood chip piles that had accumulated at the Bay Shore property prior to the shut down caught fire and burned for several days. The fire spread to the adjacent pieces of property as well. The Town of Islip, the municipality in which HPL's facility sits, expended over $1,000,000 to fight the fire and for emergency clean-up costs on the Debtor's property and on the adjoining property. To secure repayment of the fire-related and clean-up expenses, the Town of Islip assessed a real property tax lien against the Debtor's Bay Shore property for the entire amount of the clean-up costs.[2] Pursuant to various local legislative requirements, the County later reimbursed the Town of Islip for the clean-up costs and has

---

1. The term of the PGA expires in the year 2007. The Debtor has assumed the PGA. The Court is presently in the process of conducting evidentiary hearings to determine the amount of arrears to be cured under the PGA.

2. The lien of Suffolk County is currently the subject of a pending proceeding commenced by Oak Re to determine the validity, extent and priority of the liens between Oak Re, the Town of Islip and the County.

now asserted its rights as lienholder on the Bay Shore property, in place of the Town of Islip.

On September 11, 1995, the Debtor agreed to a Consent Order with the DEC which, *inter alia*, requires the Debtor and its related entities to develop a work plan to clean up its site. HPL and its related entities filed a clean-up plan with the DEC on October 17, 1995.

Because of the injunction that resulted from the DEC's litigation and the subsequent Consent Order entered into by the Debtor, the Debtor was required to expend substantial sums to do the necessary clean-up. However, the Debtor had ceased operating and did not have the necessary funds to adequately clean-up the property so as to remove the injunction obtained by DEC. The Debtor filed its Chapter 11 petition on November 14, 1995.

The DEC approved HPL's work plan on November 17, 1995.

As part of its overall attempt to reorganize, the Debtor has sought financing from several entities in the energy producing field in order to obtain sufficient funds to clean-up its property and recommence operations. Though many firms expressed initial interest in making a loan, or a purchase of the Debtor's business, only Enron has made an offer to lend funds to the Debtor. The necessity for substantial sums of money to be expended to perform the clean-up before the Debtor can resume its operations appears to have inhibited any other lender from coming forward.

Among other provisions, the pertinent terms of the financing, as outlined in the Memorandum of Understanding, are as follows. Enron will loan the Debtor a maximum of $750,000. HPL will be able to draw down money against the $750,000 fund pursuant to a mutually agreeable draw down schedule. The loan is payable one year from the date on which HPL recommences operations. The rate of interest, to be set two days before the closing, will be 820 basis points over the 1 year United States Treasury Rate. There will be a 3% structuring fee (of the total loan amount) for the making of the loan, payable to ECT Securities Corp. on the closing date from the loan proceeds. There is also a 0.5% commitment fee on any unused amount of the loan. As security for the loan, Enron will receive a super priority administrative claim under § 364(c) of the Code and pursuant to Section 364(d), a priming lien on all of the Debtor's assets, as well as an assignment of and a first priority security interest in all revenues the Debtor receives from the sale of electric power. In addition to other conditions set forth in Attachment A to the Memorandum of Understanding, the closing of the contemplated transaction is subject to satisfactory resolution of the Debtor's disputes with LILCO and its landlord and entry of a final non-appealable order providing for the consent of the DEC to the resumption of HPL's power producing business.

There is presently pending and as yet undetermined, a challenge by Oak Re as to the extent and priority of the County's lien. However, for the purpose of this motion, the decision is based on the facts as they presently exist and were raised before the Court.

Out of the loan proceeds the Debtor has budgeted approximately $300,000–$400,000 for the clean-up of the Debtor's Bay Shore property to the satisfaction of the DEC, and the balance shall be used for Debtor's start-up operational needs.

The bondholders are represented by Oak Re and its counsel. Oak Re has a valid perfected first lien on all of the Debtor's property, real and personal. Although Oak Re initially objected to the proposed financing, following the Debtor's amendment of the Enron financing by the filing of a supplemental application and revised Memorandum of Understanding, it has agreed to subordinate its claim to Enron pursuant to the Financing Agreement, and support its approval. Though papers were also submitted in opposition by the DEC and the landlord, the only party that raised significant opposition to the approval of the financing arrangement was the County which claims a lien on the Debtor's property in a sum in excess of one million dollars. They did not file papers in opposition, but orally raised substantial objections claiming that their one million dollar

lien should not be subordinated to the loan being made by Enron as they are not being provided with adequate protection for their lien.

There were several scheduled hearings, which were adjourned to enable the parties to present evidence to the Court as to the issues raised both in support and in opposition to the Debtor's motion to have this Court approve the financing to be provided by Enron on the terms outlined, which included a super priority lien. At the evidentiary hearing, the Debtor presented evidence to support its application. The County, although it had adequate opportunity to do so, chose not to present any contradictory evidence or other independent evidence on its behalf, but relied upon its cross-examination of the Debtor's witnesses and its oral arguments made at the hearing. In short, there was no contradictory evidence introduced by the County.

### FINDINGS OF FACT

The Debtor filed a voluntary petition for reorganization relief under Chapter 11 of the Bankruptcy Code on November 14, 1995. The Debtor thereafter continued in possession and control of its assets as a debtor-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

The Debtor's primary assets consist of an approximate two (2) acre parcel of real property and a pre-fabricated type building with equipment therein located at Bay Shore, New York, together with a cogeneration agreement that it has with LILCO.

This cogeneration agreement with LILCO is not assignable.

All of the Debtor's property, real and personal, is subject to a validly perfected blanket lien held by Oak Re on behalf of the bond holders in the sum of $4,500,000.00 and there is no equity in any of the Debtor's property.

Subsequent to the perfection of Oak Re's lien, the County holds a lien filed in Suffolk County against the Debtor's real property for the sum of $1,000,000.00.

By operation of law, the County's lien primes the lien of Oak Re on the Debtor's real property.

The value of the Debtor's raw land is $275,000.00.

The Debtor has no other assets, and no other source for funding the clean-up of the sites; for operating or for expenses.

The Debtor is prohibited from operating its business pursuant to an injunction obtained by the DEC which requires the Debtor to clean-up the premises pursuant to DEC regulations before the Debtor can operate and generate any income.

The cost of the required clean-up is estimated to be between $300,000 and $400,000.

The Debtor's need for financing if it is to continue to operate and reorganize is not in dispute.

If the Debtor is not able to clean-up the premises and remove the injunction imposed by the DEC, the Debtor cannot operate and will have to cease operations and the case will thereafter be dismissed or converted to a Chapter 7. The secured creditors would then be entitled to foreclose on its security interest.

The real property upon which the County has its lien would remain encumbered by the cost of clean-up.

Oak Re does not oppose the subordination of its secured claim. Only the County of Suffolk is vehemently opposed to the requested relief claiming it is not adequately protected.

The real property is encumbered with a pre-fabricated type building, and equipment which are of little value and subject to the first lien of Oak Re. According to testimony presented, the only valuable items of personalty are turbines, which would probably be removed by Oak Re. The balance of the machinery, equipment and building is purportedly of very little value and probably would be abandoned by Oak Re rather than have Oak Re incur the costs of removal.

In the event of a foreclosure by the County and an abandonment, Suffolk County would have the following choices: it could either sell the real property (a) subject to the cost to clean it up to the satisfaction of the DEC, or (b) at a reduced amount based on the

necessary cost of clean-up of the premises, and the cost of removal of whatever may have been abandoned by the Debtor and the secured creditor.

It is not likely that any purchaser of the property would wish to keep and use the machinery that would be abandoned since it was specially created for the generation of steam for the purposes of creating electricity. No purchaser of the property would be entitled to obtain any of the Debtor's rights in its cogeneration agreement.

The loan by Enron to the Debtor would enable the Debtor to expend the funds necessary to clean up the property to the satisfaction of the DEC and to commence operation of its business.

Without the clean-up of the property, the injunction imposed by DEC would inhibit any potential purchaser from being able to utilize the property for any purpose, even if it found the building and abandoned equipment to have some use. In fact, without a clean-up of the property sufficient to satisfy the injunction placed on it by the DEC, the property has no monetary value.

The loan is ear-marked for the clean-up and start-up of the Debtor's business. The investment by the Debtor of $300,000–$400,-000 to clean-up the property enhances the value of the collateral as to both the County and Oak Re.

The testimony reveals that the Debtor has made adequate attempts to obtain financing, but has not been able to obtain any loans, extension of credit, or financing other than the offer being made by Enron.

After the clean-up, the County's lien will be improved to the extent of the cost for the clean-up, i.e. $300,000–$400,000. The clean-up would enable the Debtor to commence operating and as an operating business, all of the Debtor's assets would increase in value. Although it is not clear what that value would be, it certainly would be of a greater value than the value of the Debtor's property in its present state. Debtor's sole shareholder testified that its value as an operating, ongoing concern could be worth several million dollars.

In light of the fact that the projected property improvements to be made with the borrowed funds will improve the value of the County's collateral to the extent of at least $300,000 and that the value of the County's lien in its present state is zero, it follows that the County's interest will not be diminished, but will be adequately protected.

In the event the Debtor cleans up the property and is able to operate, the County is in a position to recover the full value of its lien.

In the event that the Debtor utilizes the loan proceeds to clean up the property and is not successful in continuing the business, Suffolk County has had its collateral improved to the extent of the clean-up. If the raw land is valued at $275,000, that value can only be obtained if there is a clean-up and release of the DEC injunction.

### DISCUSSION

11 U.S.C. § 364 provides the mechanism by which a debtor may obtain credit. 11 U.S.C. § 364(d)(1) enables a debtor to obtain financing secured by a lien senior to all other interests and provides as follows:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A) The trustee is unable to obtain such credit otherwise; and
>
> (B) There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

A debtor-in-possession has the rights, powers and duties of a trustee pursuant to 11 U.S.C. § 1107(a). Therefore, the Debtor, as a debtor-in-possession, may utilize 11 U.S.C. § 364(d) to obtain credit. The Debtor has the burden of proving that the requirements of this section have been met. *In re 495 Central Park Avenue Corp.*, 136 B.R. 626 (Bankr.S.D.N.Y.1992); *In re Reading Tube Industries*, 72 B.R. 329, 331–32 (Bankr. E.D.Pa.1987); *In re Ames Department*

*Stores, Inc.,* 115 B.R. 34 (Bankr.S.D.N.Y. 1990).

The Debtor has provided unrefuted testimony that the Debtor has been unable to obtain financing less onerous to his secured creditors. In fact, during the course of this case, the Court has offered to permit any party in interest, including DEC, the Landlord, Oak Re, Suffolk County, and any other party the right to clean-up the premises and obtain an administrative lien for the cost of the clean-up. No one offered to provide the costs of the clean-up on any secured basis. The Debtor has provided testimony to support the finding that the Debtor has not been able to obtain credit without priming its senior liens.

### Adequate Protection.

Pursuant to 11 U.S.C. § 364(d), the Debtor must present evidence that the interest of the holder of an existing lien on its property is adequately protected. Adequate protection is not expressly defined. The statute confers upon "the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved." House Report # 95–959, 95th Cong. 1st Session (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 6296. The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests. *In re 495 Central Park Avenue Corp.;* 136 B.R. 626 at 631; *In re Beker Industries Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y.1986).

Section 506 of the Bankruptcy Code enacted as part of the extensive 1978 revision of the Bankruptcy Laws, governs the definition and treatment of secured claims, *i.e.,* claims by creditors against the estate that are secured by a lien on property in which the estate has an interest. Subsection (a) of Section 506 provides that a claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that is considered unsecured. *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

Since this Court has valued the secured lien of Suffolk County as of this moment at zero, or at best having a possible raw land value of $275,000, any improvement to the Debtor's real property by way of a clean-up sufficient to remove the injunction of DEC will greatly improve the value of the collateral upon which Suffolk County has a lien. Therefore, since the clean-up to the satisfaction of the DEC is a condition precedent to the loan, Suffolk County is adequately protected. There is no question in this Court's mind that the property will be improved by the clean-up since it is presently either unsaleable or has a nominal value at best, because of the restraint imposed by the DEC regulations. Without this investment and improvement to Debtor's property, the County itself may have to invest the cost of the clean-up if it wishes to have any benefit from its collateral. It is further clear to this Court that the investment made to clean-up the property will result in a benefit not only to the Debtor and its estate, but to all secured creditors and parties-in-interest.

HPL could not obtain credit secured by a lien junior to Suffolk County's secured position despite diligent efforts. The Debtor cannot obtain financing secured by a lien on unencumbered property pursuant to 11 U.S.C. § 363(c)(2) because there is no property in the estate which is not already subject to a lien. The Debtor's property is encumbered by the lien of Suffolk County and Oak Re, each of which liens exceed the value of the property liened.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (D).

2. In this case, the Debtor has presented sufficient evidence that both prongs of 11 U.S.C. § 364(d) have been satisfied.

3. Suffolk County is adequately protected.

4. The Debtor's motion to obtain senior priority financing pursuant to 11 U.S.C. § 364(d) is granted.

5. The Debtor may borrow the money from Enron pursuant to the terms and conditions of the financing arrangement.