In the
United States Court of Appeals
For the Seventh Circuit

No. 01-3055

In the Matter of:

Qualitech Steel Corporation,

Debtor

Appeal of:

Official Committee of Unsecured Creditors

Appeal from the United States District Court
for the Southern District of Indiana,
Indianapolis Division.
No. IP 00-496-C H/G--David F. Hamilton, Judge.

Argued December 4, 2001--Decided December 21, 2001


  Before Bauer, Posner, and Easterbrook,
Circuit Judges.

  Easterbrook, Circuit Judge.  Qualitech
Steel Corporation had a short, unhappy,
and expensive life. Formed in 1996 to
exploit new technologies for producing
specialty steels, Qualitech spent more
than $400 million building two plants.
Both took longer to build than expected,
were more costly to construct and operate
than expected, and generally performed
below expectations. By March 1999, when
it entered bankruptcy, Qualitech had not
reached full scale and was losing about
$10 million a month trying to get there.
It owed secured lenders about $265
million; the security included almost all
of the firm's assets. Management deemed
Qualitech's facilities worth about $225
million when the bankruptcy proceeding
began, so the unsecured creditors had
little to hope for--little, but not
nothing. Qualitech has sought to recover
about $4 million from creditors in
preference-avoidance actions under the
Bankruptcy Code, and these recoveries
would be shared among all unsecured cred
itors (including the secured lenders, to
the extent their loans exceeded the value
of the security).

  Everyone recognized from the outset that
the plants should be sold, either to an
established producer or to someone

willing to take considerable risk in an effort to get the plants working to original hopes. Some investment in keeping the operations going pending sale might be justified as the purchase of an option in obtaining the benefits of any upturn in the business's prospects. Efforts to obtain new financing were unsuccessful, however, as all available assets were encumbered. Some (but not all) of the original secured lenders offered to put a total of $30 million in new capital into the venture, if they received a super-priority interest. Such a transaction required demoting the other secured lenders' position and substituting new security under 11 U.S.C. sec.364(d)(1). The only other assets in sight were the proceeds of preference-recovery actions (also known as avoidance actions). After notice and a hearing, the bankruptcy court approved debtor-in-possession (dip) financing of $30 million, with super-security and an award of replacement security to the senior lenders, to the extent that this was necessary to maintain their financial position. No one appealed or sought a stay. In August 1999 all of Qualitech's operating assets were sold for consideration that the bankruptcy court deemed equivalent to $180 million. (The bid was complex and subject to potential adjustments that could raise or lower its effective value. The unsecured creditors contended that the bid should be valued at $227 million, but the bankruptcy judge chose the lower value. No one doubts that this bid, whatever its worth, was the best deal that could be obtained.)

The first $30 million of the proceeds went to the dip financers, leaving $150 million for the old secured creditors. They accordingly invoked the provision giving them extra security--first dibs in the preference-recovery kitty, which would make up some but far from all of the loss. The unsecured creditors contended, however, that the securedlenders could not have lost anything; after all, if the $30 million investment were prudent, it should have improved these creditors' position. But the bankruptcy judge concluded that good money had been thrown after bad, that the secured lenders' position had been eroded by at least the value of the anticipated preference recoveries, and that they therefore were entitled to a substitute

security interest in that collateral. The district court affirmed, and the unsecured creditors have appealed to us. As a practical matter, the decision is final for the purpose of 28 U.S.C. sec.158(d), because the plan for the distribution of the sale proceeds is the effective plan of reorganization. All of Qualitech's operating assets have been sold; the secured lenders' claim reaches all actual and potential assets of the estate, and the unsecured lenders have been wiped out. Particular avoidance actions remain to be decided, but each is a separate adversary action, independently appealable later. See In re Morse Electric Co., 805 F.2d 262 (7th Cir. 1986). What we have now winds up the main proceedings, and the existence of these collateral avoidance disputes does not make the order less final.

Even if the sale should be valued at $227 million rather than $180 million, the secured creditors suffered a loss as a result of the dip financing. They had security worth $225 million going in and $197 million (maximum) coming out. The difference is substantially more than the highest estimate of any sums that could be recovered in avoidance actions, so sec.364(d)(1) entitles the secured lenders to those sums. This assumes that the assets really were worth $225 million in March 1999. Maybe they weren't; if whoever owned them had to pony up $10 million per month to keep them viable, the discounted value of that expenditure stream had to be subtracted from the anticipated sale price in order to determine the assets' present value. If Qualitech had turned over the keys and deeds to the secured lenders in March, they would have had to bear these costs themselves. Yet the $225 million value is the original estimate of Qualitech's management; it is not some hokey number that the secured creditors cooked up to disguise the fact that maintenance outlays had to be subtracted from any eventual sale price. The unsecured creditors might have argued in the bankruptcy court that $225 million was just a seat-of-the-pants figure that should be reevaluated to determine how much the secured lenders really lost. But no such argument was made in either the bankruptcy court or the district court, and hints along these lines in the appellate brief are far too late. We must

take it as established that (a) in March 1999 the secured creditors had interests worth $225 million, yet (b) in August 1999 these interests were worth, at most, $197 million after paying off the diplenders. These two figures compel affirmance of the judgment.

   Instead of tackling this calculation head on, the unsecured creditors beat about the bush. They contend, for example, that courts do not favor using sec.364 to give pre-petition lenders security interests in the proceeds of avoidance actions. That's an accurate assessment. Section 364(d) is supposed to be a last resort. See Douglas G. Baird, The Elements of Bankruptcy 187-88 (rev. ed. 2001). The statutory text itself conveys that message (emphasis added):

(d) (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--(A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

Perhaps the authorization of dip financing and the associated use of preference-recovery proceeds for "adequate security" was imprudent; that some of the secured lenders refused to advance any more funds, even with super-security, suggests as much. (Though the fact that others of their number put up extra money, knowing that they were undersecured, implies a belief that keeping Qualitech alive had a positive option value.) But the time to make this point is long past. The bankruptcy judge did authorize financing with additional security to the original lenders. The unsecured creditors did not seek a stay, and it is too late to tell those among the secured lenders that opposed this dip financing that they, rather than the unsecured creditors, must swallow the loss from the decision even though sec.364(d) requires their protection.

   The unsecured creditors' remaining

arguments fare no better. It makes no difference who bears the burden of persuasion on valuation issues under sec.364(d), because the secured lenders lost more than the value of the avoidance actions on any calculation. And the argument that we should reverse the judgment so that the bankruptcy judge can receive additional evidence from the secured creditors' files overlooks the fact that the unsecured creditors did not seek this information until the day before the evidentiary hearing (too late, the bankruptcy judge held) and did not raise the discovery issue on appeal to the district court until filing their reply brief. The point has been forfeited.

Affirmed